[No. 28391. *En Banc.* January 23, 1942.]

UNION PACIFIC RAILROAD COMPANY, *Respondent*, v. EYRES TRANSFER & WAREHOUSE COMPANY, *Appellant.*[1]

[1]Reported in 121 P. (2d) 340.

*Monheimer & Griffin,* for appellant.

*Fred S. Merritt, Hayden, Merritt, Summers & Bucey,* for respondent.

MAIN, J.—This action was brought for the purpose of recovering a charge for freight. The cause was tried to the court and a jury, and resulted in a verdict for the defendant. The plaintiff moved for a judgment notwithstanding the verdict, which was sustained, and from the judgment entered in the sum of $552.51, which included the freight charge and interest thereon, the defendant appealed.

The facts are these: The Bestway, Inc., is a corporation with its principal place of business in Los Angeles, California, and it is a shipper of merchandise. It assembles freight of different parties which is consolidated into carload lots and shipped to a designated point, thus reducing the rate to its customers from what it would be if the individual lots were shipped separately. The Eyres Transfer & Warehouse Company is a transfer company, as its name indicates, with its principal place of business in Seattle, this state. The Southern Pacific Railway Company has a line extending from Los Angeles to Portland, in the state of Oregon. The Union Pacific Railroad Company has a line extending from the latter city to Seattle.

March 6, 1937, the Bestway company shipped a carload of freight from Los Angeles, the destination of which was Seattle. This car was consigned, by the bill of lading, to the Eyres Transfer & Warehouse Company. It moved over the Southern Pacific as far as Portland; then, the car was transferred to the line of the Union Pacific. It arrived in Seattle, either the

evening of the tenth of March, 1937, or sometime during the early morning of the eleventh. The Eyres company was notified of its arrival, and was informed that the car had been billed to it collect. The Eyres company refused to accept the car. Thereafter, and probably during the same day, a telephone conversation took place between the Eyres company and the Bestway company, and a day or two later the Eyres company received a letter from the Bestway company, stating, in part, that the letter was intended to confirm the telephone conversation which the two companies had previously had, and contained this paragraph:

"With regards to car GN 43015 now holding, will you ask the Union Pacific to have the carload freight charges collected from us as shippers, this car should have been prepaid."

After the letter was received, the Eyres company, by messenger, sent a copy of the paragraph quoted to the Union Pacific at its offices in Seattle. The Union Pacific informed the Southern Pacific of the situation, and the bill of lading was changed from "collect" to "prepaid." The freight was delivered to the Eyres company, and was distributed to the various parties, as directed. The Union Pacific thereafter attempted to collect the freight charges from the Bestway company and was unable to do so, apparently because of its insolvency.

About two years later, the Union Pacific brought the present action against the Eyres company to collect the freight charge, with the result above stated. It must be remembered that this freight moved in interstate commerce. Chapter one of the Interstate Commerce Act, 49 U. S. C. A. (Sup.), § 3 (2), contains a provision that, when a carload of freight is billed to an agent, or someone other than the owner of the

freight, as consignee, such consignee can relieve itself from liability for the freight charge, provided that it,

". . . prior to delivery of the property has notified the delivering carrier in writing of the fact of such agency and absence of beneficial title. . . ."

In the present case, the Eyres company did not, before it received delivery, notify the Union Pacific in writing that it was not the owner of the property, as the statute requires, in order to relieve itself from the obligation to pay the freight charge.

█ The Eyres company's principal contention is that the Union Pacific, by its conduct, is estopped from maintaining the action.

In the case of *Pittsburgh etc. R. Co. v. Fink*, 250 U. S. 577, 63 L. Ed. 1151, 40 S. Ct. 27, an action was brought to recover from the consignee the balance of a freight charge which was not paid at the time of the delivery of the goods through a mistake of the railroad company as to the amount. The action was sustained, and, with reference to estoppel, it was there said:

"Nor can the defendant in error successfully invoke the principle of estoppel against the right to collect the legal rate. Estoppel could not become the means of successfully avoiding the requirement of the act [Interstate Commerce Act] as to equal rates, in violation of the provisions of the statute."

In *Louisville & Nashville R. Co. v. Central Iron & Coal Co.*, 265 U. S. 59, 68 L. Ed. 900, 44 S. Ct. 441, it was held that a consignee, by accepting a shipment, becomes liable, as a matter of law, for the full amount of the tariff charges, whether they are demanded at the time of delivery or later. It was there said:

"For, under the rule of the *Fink Case*, if a shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges, whether they are demanded at the time of delivery, or

not until later. His liability satisfies the requirements of the Interstate Commerce Act."

In the case of *New York Central & Hudson River R. Co. v. York & Whitney Co.*, 256 U. S. 406, 65 L. Ed. 1016, 41 S. Ct. 509, by a mistake of the carrier, the charges collected were less than the lawful rates established by the Interstate Commerce Act, and it was held that the consignee was liable for the balance, irrespective of contract and as a matter of law. It was there said:

"We think the doctrine announced in *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink,* 250 U. S. 577, (November 10, 1919), is controlling, and that the liability of York & Whitney Company was a question of law. The transaction between the parties amounted to an assumption by the consignee to pay the only lawful rate it had the right to pay or the carrier the right to charge. The consignee could not escape the liability imposed by law through any contract with the carrier."

In the case of *Central Warehouse Co. v. Chicago, R. I. & P. R. Co.,* 20 F. (2d) 828, it was said:

"The initial carrier in this case by mistake caused the bill of lading to indicate that the freight charges had been paid by the consignor. The duty imposed upon the carrier by the act applicable to interstate shipments was to collect the lawful rate. This obligation was not only in its own interest, but in the interest of the public. It is not permitted to escape its duty by an oversight and thereby effect a discrimination. It is not within its power to so conduct itself that the plain terms of the statute will amount to nothing. The unintentional act of the carrier does not estop it from demanding payment of the lawful charge."

The cases of *Great Northern R. Co. v. Hyder,* 279 Fed. 783, *Western & Atlantic R. Co. v. Underwood,* 281 Fed. 891, and *Chicago & Northwestern R. Co. v. J. I. Case Plow Works,* 173 Wis. 237, 180 N. W. 846,

are to the same effect. In the first of the last three cases cited, it is said:

"The shipper, the carrier, and the consignee are all agents and trustees for the public, and no complications arising out of the agreements between them, or shuffling, should defeat the purpose of the act requiring the full and exact payment of the freight as fixed by the filed, posted, and published tariff."

13 C. J. S. 755, § 316, states the general rule as it appears from the excerpts above quoted, and concludes with the statement that, although the carrier has delayed seeking to enforce the liability of the consignee until after the consignor has become insolvent, it may, nevertheless, maintain the action.

It necessarily follows that the Eyres company, not having given written notice that it was not the owner of the freight involved here, as required by the Interstate Commerce Act above referred to, cannot invoke the doctrine of estoppel as against the carrier, or rely upon any agreement that it and the carrier may have made with reference to the collecting of the freight charges from the shipper.

The liability of the Eyres company depending upon a question of law, and not upon a question of fact, the superior court did not err in granting the motion for judgment notwithstanding the verdict.

The judgment will be affirmed.

ROBINSON, C. J., MILLARD, BLAKE, JEFFERS, and DRIVER, JJ., concur.

STEINERT, J. (dissenting)—This case does not, in my opinion, fall within that provision of 49 U. S. C. A. (Sup.), § 3 (2), upon which the majority opinion relies. That provision has reference to consignees generally who, by *accepting* delivery of freight, become liable, as a matter of law, for the transportation charges.

The case at hand presents a situation where the consignee, who would otherwise have become liable for the charges by mere acceptance of delivery of the freight to it, positively refused to accept such delivery unless the charges were prepaid, and where the carrier, after inquiry and with full knowledge of the facts, made delivery on a prepaid basis, thereby representing to the consignee that the charges had in fact been paid.

This case is also to be distinguished from those wherein a consignee who, though legally liable for the transportation charges, actually paid an amount less than the lawful rate. In such instances, the consignee is liable for the unpaid amount, for the reason that he is presumed to know the lawful rate, and his liability goes to the full extent of the lawful charges. That situation is quite different from the one presented here, where the question is not one of *amount* of legal charges, but rather of *legal liability for any amount*.

The carrier in this instance knew, when delivery to the consignee was first tendered, that the transportation charges had not been paid. It knew, also, that under 49 U. S. C. A. (Sup.), § 3(2), it could not lawfully deliver or relinquish the freight until all tariff rates and charges therefor had been paid. Upon refusal of delivery by the consignee because the charges were not prepaid, the carrier communicated with its connecting carrier and, so far as the consignee could know, communicated with the original shipper as well. With full knowledge of the facts, the carrier then changed the billing to read "prepaid" and made delivery to the consignee on that basis. The consignee had every reason and right to believe that the carrier had collected the freight charges from the consignor and thus enabled itself, the carrier, to make delivery in compliance with the statute. Had the consignee

known that the charges had not in fact been paid, it could again have refused to accept delivery, or else, upon accepting delivery, it could have protected itself by retaining the goods until the consignor had reimbursed it for the amount of freight charges advanced. That right of protection, however, is now lost to the consignee, for the goods have gone out of its possession, and the consignor is insolvent.

To construe the statute as the majority opinion construes it, is to require every consignee of freight which is shipped prepaid to satisfy himself, before accepting delivery, that the freight charges have actually been paid. In other words, the consignee must dispute a fact which the carrier asserts to be true, or else run the risk of being held liable if, years later, the carrier claims that what it had formerly asserted to be true, is not in fact true.

Conceding that it is a matter of "public interest" that carriers collect the lawful rate of charges from all shippers, without discrimination, I am of the opinion that private rights are also entitled to protection, and that the protection of the latter, in a case such as we have here, will in no proper sense tend to prejudice those rights of the public which the statute was designed to protect.

I dissent.

BEALS and SIMPSON, JJ., concur with STEINERT, J.